**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Marshall M. Searcy III (*Pro Hac Vice* Forthcoming)
marshallsearcy@quinnemanuel.com
Gregory A. Fuoco (*Pro Hac Vice* Forthcoming)
gregfuoco@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Christina I. Crowley
christinacrowley@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

*Attorneys for Plaintiff Grillo's Pickles, Inc.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| GRILLO'S PICKLES, INC., a Delaware corporation, <br><br> Plaintiff, <br><br> v. <br><br> PATRIOT PICKLE INC., a Delaware corporation, ARKK FOOD COMPANY, a Michigan corporation, and WAHLBURGERS I, LLC, a Massachusetts limited liability company. <br><br> Defendants. | Civil Action No. 2:23-cv-00011 <br><br> **Hon. Madeline Cox Arleo** <br> **Hon. André M. Espinosa** |

**PLAINTIFF GRILLO'S PICKLES, INC.'S MEMORANDUM OF LAW IN
SUPPORT OF APPLICATION FOR (1) AN ORDER TO SHOW CAUSE
WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE AND (2) AN
<u>ORDER PERMITTING EXPEDITED DISCOVERY</u>**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................ 1

II.   STATEMENT OF RELEVANT FACTS ................................. 2

    A.    Background on Grillo's Pickles .................................. 2

    B.    Background on Defendants ......................................... 3

    C.    Defendants ARKK and Patriot Are the Apparent Agents of Wahlburgers I, LLC ................................................. 4

    D.    Grillo's Relationship with Patriot ............................. 6

    E.    Wahlburgers Pickles Are Co-Packed By Patriot .......... 7

III.  ARGUMENT ................................................................. 12

    A.    Legal Standard ...................................................... 12

    B.    Grillo's Will Likely Succeed on the Merits of Each of its Claims .... 13

    C.    Grillo's Has Suffered and Will Continue to Suffer Irreparable Harm if Injunctive Relief is Not Granted ...................... 30

    D.    The Balance of Equities Favors Grillo's ....................... 31

    E.    An Injunction Will Serve the Public Interest ................. 32

IV.   GRILLO'S IS ENTITLED TO EXPEDITED DISCOVERY .................. 33

V.    CONCLUSION ................................................................ 37

# <u>TABLE OF AUTHORITIES</u>

<u>**Page**</u>

<u>**Cases**</u>

*AT&T v. Winback & Conserve Program, Inc.*,
  42 F.3d 1421 (3d Cir. 1994) .................................................................. 4, 5

*Better Packages, Inc. v. Zheng*,
  No. Civ.A. 05-4477(SRC), 2006 WL 1373055 (D.N.J. May 17, 2006) .......... 34

*Birthright v. Birthright, Inc.*,
  827 F. Supp. 1114 (D.N.J. 1993) ............................................................. 30

*Bracco Diagnostics, Inc. v. Amersham Health, Inc.*,
  627 F. Supp. 2d 384 (D.N.J. 2009) ..................................................... 12, 19

*Broadway Pine Brands LLC v. Shiro House*,
  Civ. No. 2:21-cv-406, 2021 WL 5293528 (W.D. Pa. March 30, 2021) ........... 36

*Canfield Sci., Inc. v. Melanoscan, LLC*,
  Civ. No. 16-4636, 2017 WL 2304644 (D.N.J. May 25, 2017) ................... 15, 30

*Castrol, Inc. v. Pennzoil Co.*,
  987 F.2d 939 (3d Cir. 1993) ....................................... 14, 16, 18, 19

*Castrol, Inc. v. Pennzoil Quaker State Co.*,
  169 F. Supp. 2d 332 (D.N.J. 2001) .......................................................... 30

*Durel B. v. Decker*,
  455 F. Supp. 3d 99 (D.N.J. 2020) ........................................................... 13

*Ellsworth Assocs., Inc. v. United States*,
  917 F. Supp. 841 (D.D.C. 1996) .............................................................. 33

*Exclusive Supplements, Inc. v. Abdelgawad*,
  Civ. No. 12-1652, 2013 WL 160275 (W.D. Pa. Jan. 15, 2013) ..................... 33

*Fresh Del Monte Produce Inc. v. Del Monte Foods Co.*,
  933 F. Supp. 2d 655 (S.D.N.Y. 2013) .................................................. 14, 18

*GlaxoSmithKline LLC v. Boehringer Ingelheim Pharms., Inc.*, 484 F. Supp.
  3d 207, 225 (E.D. Pa. 2020) .................................................................. 22

*Kone Corp. v. ThyssenKrupp USA, Inc.*,
  Civ. No. 11-465-LPS-CJB, 2011 WL 4478477 (D. Del. Sept. 26, 2011) ........ 36

*Lexmark Int'l v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) .............................................................................. 22

*Nail Alliance, LLC v. TTN Beauty*,
  Civ. No. 21-cv-3140, 2021 WL 2646989 (D.N.J. Mar. 10, 2021) ............. 33, 36

*Newborn Bros. Co., Inc. v. Albion Eng'g Co.*,
  481 F. Supp. 3d 312 (D.N.J. 2020) ..................................................... 14, 31

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer
  Pharms. Co.*,
  290 F.3d 578 (3d Cir. 2002) ....................................... 18, 27, 32

*Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*,
  653 F.3d 241 (3d Cir. 2011) .................................................................. 14

*Pharmacia Corp. v. GlaxoSmithKline Consumer Healthcare, L.P.*,
  292 F. Supp. 2d 594 (D.N.J. 2003)............................................................32

*Reilly v. City of Harrisburg*,
  858 F.3d 173 (3d Cir. 2017)..............................................................12, 13

*Sawhorse Enter., Inc. v. Church & Dwight Co., Inc.*,
  Civ. No. 12-6811(FLW), 2013 WL 1343608 (D.N.J. Apr. 3, 2013)..............33

*Schering-Plough Healthcare Prods, Inc. v. Neutrogena Corp.*,
  Civ. No. 09-642-SLR, 2010 WL 1992247 (D. Del. May 18, 2010)...............17

*Spark DSO, LLC v. Ormco Corp.*,
  Civ. No. 21-2841, 2022 WL 613165 (E.D. Pa. Mar. 2, 2022) ......................30

*Sweetzel, Inc. v. Hawk Hill Cookies*,
  No. CIV.A. 95-2632, 1995 WL 550585 (E.D. Pa. Sept. 14, 1995)............31, 32

*Tracey v. Recovco Mortg. Mgmt. LLC*,
  451 F. Supp. 3d 337 (D.N.J. 2020)............................................................34

*U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*,
  898 F.2d 914 (3d Cir. 1990)....................................................................22

*W.L. Gore & Assocs. v. Totes Inc.*,
  788 F. Supp. 800 (D. Del. 1992)..............................................................32

*Warner-Lambert Co. v. Breathasure, Inc.*,
  204 F.3d 87 (3d Cir. 2000) ........................................................18, 19, 27

## Statutory Authorities

15 U.S.C. § 1116(a) ...........................................................................13, 30

15 U.S.C. §1125(a)(1) ..............................................................................13

21 U.S.C. § 343(k) ....................................................................................15

## Rules and Regulations

21 C.F.R. § 101.22(j)................................................................................16

21 C.F.R. § 101.95(a)................................................................................17

21 C.F.R. § 170.3(o)(2)............................................................................16

21 C.F.R. § 184.173(a)..............................................................................17

21 C.F.R. § 184.1733(c) ...........................................................................16

Fed. R. Civ. P. 26(d) ................................................................................33

## I.   __INTRODUCTION__

Defendants Patriot Pickle Inc., ARKK Food Company, and Wahlburgers I, LLC (collectively, "Defendants") collectively manufacture pickles under the Wahlburgers name.  Although Defendants' pickle labels claim Wahlburgers pickles are "fresh," "all natural," and contain "no preservatives," quite the opposite is true: Wahlburgers pickles contain substantial amounts of an artificial chemical preservative designed to lengthen the pickles' shelf life.

Unfortunately, in addition to duping customers into buying Wahlburgers pickles, Defendants' false and misleading statements are also irreparably harming Plaintiff Grillo's Pickles, Inc. ("Grillo's" or "Plaintiff").  Although Grillo's is a company known nationwide for producing fresh pickles that do not contain artificial chemical preservatives, Defendants' false and misleading labeling causes consumers and grocery store buyers seeking artificial-chemical-preservative-free pickles to purchase and stock Wahlburgers pickles to the detriment of Grillo's sales, allotted shelf space, market share, and goodwill.

This harm is amplified by the fact that Defendants created Wahlburgers pickles to mirror Grillo's as closely as possible: Wahlburgers pickles (1) are formulated to taste nearly identical to Grillo's pickles; (2) use similar naming conventions as Grillo's pickles; (3) contain the same nutritional fact panels as Grillo's pickles; and (4) are packaged in plastic jars that are nearly identical to

Grillo's.  Not only does this increase the amount of sales, shelf space, and market share Defendants divert from Grillo's, but it also causes many consumers to mistakenly believe Wahlburgers pickles are actually manufactured by Grillo's, thus damaging Grillo's goodwill.

In short, Defendants should not be permitted to compete unfairly by duping customers and grocery store buyers in violation of the Lanham Act and common law.  Thus, Grillo's respectively requests the Court order expedited discovery and issue a preliminary injunction: (1) enjoining Defendants from making false and misleading statements claiming that Wahlburgers pickles contain "no preservatives," are "all natural," or are "fresh"; and (2) ordering Defendants to include the name of the artificial chemical preservative they are using in Wahlburgers pickles as an ingredient on the pickles' labels and describe it as a "chemical preservative."  Alternatively, Grillo's requests the Court enjoin Defendants from selling Wahlburgers pickles that contain any artificial chemical preservatives.

## II.    **STATEMENT OF RELEVANT FACTS**

### A.    **Background on Grillo's Pickles**

Grillo's is a pickle company founded by Travis Grillo in 2008 when he began selling pickles using his grandfather's 100-year-old recipe out of a hand-built wooden cart on the streets of Boston.  (Compl. ¶ 7.)  Since then, Grillo's has

evolved into a nationwide brand known for producing fresh pickles that do not contain artificial chemical preservatives. (*Id.* ¶ 21.) Customers choose Grillo's because they know that when they purchase Grillo's pickles, they are purchasing fresh pickles free from artificial chemical preservatives. (*Id.*) Additionally, retailers, cognizant of many consumers' preference for clean foods with clean labels, choose to stock Grillo's over other brands because retailers know Grillo's pickles are fresh and free from artificial chemical preservatives. (*Id.*)

### B.   <u>Background on Defendants</u>

Defendant Patriot Pickle Inc. ("Patriot") is a pickle manufacturer. (Compl. ¶ 22.) A substantial amount of Patriot's business involves "co-packing," a practice in which one company (the co-packer) contracts to manufacture, package, label, and ship food brands owned by others. (*Id.*) As is relevant here, Patriot is a co-packer for Defendant ARKK Food Company ("ARKK") and Defendant Wahlburgers I, LLC ("Wahlburgers"). (*Id.*) In its capacity as such, Patriot manufactures, packages, labels, and ships Wahlburgers pickles from Patriot's facility in Wayne, New Jersey on behalf of ARKK and Wahlburgers. (*Id.* ¶¶ 8, 22.)

Defendant ARKK is the distributor for Wahlburgers pickles, is the exclusive licensee of Wahlburgers' retail products, and controls the entire line of Wahlburgers retail products, including Wahlburgers pickles' recipes and labeling.

(Fuoco Decl. ¶¶ 4, 6, Ex. C; *see id.* ¶¶ 2-3, 5, Exs. A, B, D.)  ARKK, upon

information and belief, engaged Patriot to manufacture, package, label, and ship

Wahlburgers pickles on ARKK's behalf.  (*Id.*; Compl. ¶ 9.)  On information and

belief, ARKK also selected and approved the recipe for Wahlburgers pickles

jointly with Patriot, and ARKK and Patriot jointly created the labels for

Wahlburgers pickles.  (*Id.*)

Defendant Wahlburgers I, LLC is the owner of the Wahlburgers trademarks

that appear on Wahlburgers pickle labels and has licensed these trademarks to

ARKK.  (Fuoco Decl. ¶ 8, Ex. F.)  Upon information and belief, Wahlburgers I,

LLC has control over the Wahlburgers pickles' recipes and labeling as the licensor

of the Wahlburgers trademarks and by virtue of its contractual relationship with

ARKK.  (Fuoco Decl. ¶¶ 6-8, Ex. F.)

## C.   Defendants ARKK and Patriot Are the Apparent Agents of Wahlburgers I, LLC

Both ARKK and Patriot are the apparent agents of Wahlburgers I, LLC, and

thus Wahlburgers I, LLC is liable for their misrepresentations regarding

Wahlburgers pickles. *See AT&T v. Winback & Conserve Program, Inc.*, 42 F.3d

1421, 1440 (3d Cir. 1994).  Under the doctrine of apparent agency, a principal is

liable for its apparent agent's torts against third parties when "the principal is

responsible for the third person believing that the person with whom she deals is an

agent, or if the principal should realize that his conduct is likely to induce such

belief[.]" *Id.* at 1439.  For instance, in *AT&T v. Winback & Conserve Program*, the Third Circuit held a principal telecommunications service reseller could be liable under the Lanham Act for its independent sales agents' misrepresentations when "[the principal] authorized its sales agents to conduct transactions as though they were [the principal,]" and "third parties reasonably relied on that relationship in deciding to enter into contracts[.]" *Id.* at 1440 ("[The principal] held its representatives out to the public as its servants or as itself, and that the third parties reasonably relied on that relationship in deciding to enter into contracts").

Similarly here, although Wahlburgers pickles are manufactured, packaged, labeled, and distributed by a combination of Patriot and ARKK (Fuoco Decl. ¶¶ 4, 6, Ex. C; *see id.* ¶¶ 2-3, 5, Exs. A, B. D), Wahlburgers pickles are held out to the public as being manufactured, packaged, and labeled by or on behalf of Wahlburgers I, LLC.  For instance, Wahlburgers pickle containers are covered with trademarks owned by Wahlburgers I, LLC; a substantial portion of Wahlburgers I, LLC's name (*i.e.*, "Wahlburgers") appears prominently on the Wahlburgers pickle labels and in the pickles' names; and pictures of the Wahlberg family, members of which control Wahlburgers I, LLC, are a central feature of the Wahlburgers pickle labels.  (Fuoco Decl. ¶¶ 7-9, Exs. E-G.)

Patriot, meanwhile, is mentioned nowhere on Wahlburgers pickles' packaging.  (Fuoco Decl. Ex. G.)  Moreover, ARKK is identified only as the

distributor, and the Wahlburgers pickle labels state that ARKK is distributing the pickles only "under license of Wahlburgers, LLC." (Fuoco Decl. ¶¶ 6, 9, Ex. G.) This is despite the fact that, upon information and belief, ARKK controls the entire line of Wahlburgers' retail products. (Fuoco Decl. ¶¶ 4, 6, Ex. C; *see id*. ¶¶ 2-3, 5, Exs. A, B. D.) Upon information and belief, Wahlburgers I, LLC is aware of the appearance and statements made on the Wahlburgers pickle labels and has permitted and authorized ARKK and Patriot to continue selling Wahlburgers pickles in the manner described *supra*. (Fuoco Decl. 6, 8, Ex. F.)

Thus, given the appearance of Wahlburgers pickle labels, customers reasonably believe the pickles are being offered by Wahlburgers I, LLC and reasonably rely thereon when purchasing Wahlburgers pickles. (*Compl.* ¶ 15). Accordingly, ARKK and Patriot are the apparent agents of Wahlburgers I, LLC, and Wahlburgers I, LLC is liable for their misrepresentations regarding Wahlburgers pickles.

> ### D.   Grillo's Relationship with Patriot

In or around 2014, Grillo's engaged Patriot as one of the co-packers for Grillo's pickles. (Compl. ¶ 23.) To enable Patriot to manufacture and package Grillo's pickles, Grillo's trusted Patriot with Grillo's proprietary pickle recipes and manufacturing and packaging processes to produce pickles that do not contain artificial chemical preservatives while maintaining a lengthy shelf life. (*Id*.)

Patriot continued as one of Grillo's co-packers from 2014 until the summer of 2021, at which time Grillo's ended its relationship with Patriot. (*Id.* ¶ 24.) Accordingly, in 2014, Patriot obtained access to and had full knowledge of Grillo's proprietary recipes and processes, and at all times from 2014 through the end of Grillo's and Patriot's relationship, Patriot had full knowledge of Grillo's proprietary pickle making recipes and processes. (*Id.* ¶ 23.)

### E.   <u>Wahlburgers Pickles Are Co-Packed By Patriot</u>

In or before the spring of 2021, Patriot started producing and shipping Wahlburgers pickles on behalf of ARKK and Wahlburgers I, LLC. (Compl. ¶ 25.) Patriot co-packs three types of pickles for Wahlburgers: "Wahlburgers Fresh Dill Spears," "Wahlburgers Fresh Dill Chips," and "Wahlburgers Fresh Dill Chips Hot" (*Id.* ¶¶ 26-28):

**Wahlburgers Fresh Dill Spears** (Fuoco Decl. Ex. G at 1-3):

### Front          ### Side          ### Top



**Wahlburgers Fresh Dill Chips (***Id.*** at 4-6):**



**Wahlburgers Fresh Dill Chips Hot** (*Id.* at 7-9):

**Front**          **Side**          **Top**



As shown *supra*, each of the labels for Wahlburgers Fresh Dill Spears,

Wahlburgers Fresh Dill Chips, and Wahlburgers Fresh Dill Chips Hot inform

customers that the labels have "no preservatives" and are "all natural." (Fuoco

Decl. Ex. G at 2, 5, 8.) The labels do not list any artificial preservatives as

ingredients and instruct customers to "keep [the pickles] refrigerated." (*Id*.) The

labels also all prominently feature the word "FRESH" in all capitals as the first

word in their names, which are printed multiple times on their labels. (*Id.* at 1, 3-7, 9.)

Additionally, Wahlburgers pickles taste extremely similar to Grillo's, while using the same containers, the same naming conventions, and the same nutritional fact panels. (Compl. ¶ 25.) Wahlburgers pickles are also sold in the same refrigerated sections of many of the same stores as Grillo's and other brands that are fresh, all natural, and do not contain artificial preservatives. (*Id.* ¶¶ 25, 32, 38.)

However, despite the labels on Wahlburgers pickles stating they, *inter alia*, are "fresh," contain "no preservatives," and are "all natural," testing performed by Biogen Laboratory Developments reveals the opposite is true: Wahlburgers pickles contain substantial amounts of benzoic acid, which is often added into foods via sodium benzoate, an artificial chemical preservative designed to lengthen the pickles' shelf life. (Kahl Decl. ¶¶ 5-11.) In fact, certificates of analysis from Biogen's testing indicate[1] Wahlburgers Hot Dill Chips contain sodium benzoate in a concentration of 641 parts per million; Wahlburgers Dill Spears pickles contain sodium benzoate in a concentration of between 424 and 436 parts per million; and

---

[1]  Biogen's tests revealed the amounts of benzoic acid indicated on Exhibits A and B to the Kahl Declaration, and the data gathered by Biogen strongly suggest the benzoic acid was intentionally added to the pickles via sodium benzoate, an artificial chemical preservative. (Kahl Decl. ¶¶ 5-11.)

Wahlburgers Dill Chips contain sodium benzoate in a concentration of 600 parts per million. (Kahl Decl. ¶¶ 6-8, 10; *id*. Exs. A, B.)

For the reasons disused *infra*, Defendants' pickles label statements have caused Grillo's irreparable harm and will continue to do so absent a preliminary injunction.

## III.   ARGUMENT

Grillo's satisfies all elements necessary for this Court to issue a preliminary injunction enjoining Defendants from continuing their false and misleading advertising. In the absence of immediate injunctive relief, Defendants' Lanham Act and common law violations will continue, and the irreparable harm to Grillo's will proceed unabated.

### A.   Legal Standard

Under the Lanham Act, an injunction is the "usual and standard remedy[.]" *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 479 (D.N.J. 2009). To obtain preliminary injunctive relief, a plaintiff usually must establish (1) a reasonable probability of eventual success on the merits of its underlying claims and (2) that it will be irreparably injured in the absence of preliminary relief. *See Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017). However, in the Lanham Act context, this hurdle is lowered significantly: Once a plaintiff has shown "a likelihood of success on the merits," the plaintiff is

"entitled to a rebuttable presumption of irreparable harm[.]"  15 U.S.C. § 1116(a) (effective December 18, 2021).  After the plaintiff makes this showing, the Court considers whether the balance of equities and the public interest weigh in favor of granting relief.  *Reilly*, 858 F.3d at 179.  If "all four factors, taken together, balance in favor of granting the requested preliminary relief," it is proper to grant it.  *Durel B. v. Decker*, 455 F. Supp. 3d 99, 106 (D.N.J. 2020).

Here, for the reasons discussed *infra*, all four factors weigh in favor of granting Grillo's requested preliminary injunction.

### B.   Grillo's Will Likely Succeed on the Merits of Each of its Claims

Grillo's will likely succeed on the merits of both its Lanham Act claim and common law unfair competition claim.

### 1.   Defendants' Advertising Violates the Lanham Act

The Lanham Act imposes civil liability on any person who "uses in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which . . . misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities."  *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 107-108 (quoting 15 U.S.C. §1125(a)(1)).  In order to establish a violation of the Lanham Act, a plaintiff must demonstrate:

> (1) that the defendant has made false or misleading statements as to his own product [or another's]; (2) that there is actual deception or at

least a tendency to deceive a substantial portion of the intended audience; (3) that the deception is material in that it is likely to influence purchasing decisions; (4) that the advertised goods traveled in interstate commerce; and (5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc.

*Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241, 248 (3d Cir. 2011).  However, "[w]hen a merchandising statement or representation is literally or explicitly false, the court may grant relief without reference to the advertisement's impact on the buying public." *Castrol, Inc. v. Pennzoil Co.*, 987 F.2d 939, 943 (3d Cir. 1993).  This means that when a statement is literally false, the second element—actual deception or a tendency to deceive—is presumed. *Pernod Ricard USA*, 653 F.3d at 248.  Similarly, in the context of injunctive relief, when a statement is literally false, the third element—materiality—is also presumed.  *Newborn Bros. Co., Inc. v. Albion Eng'g Co.*, 481 F. Supp. 3d 312, 356 (D.N.J. 2020).

Notably, claims based on competitors' labeling misstatements, including those in the current action regarding preservatives, fall squarely within the Lanham Act.  *POM Wonderful*, 573 U.S. at 106 ("Competitors, in their own interest, may bring Lanham Act claims like POM's that challenge food and beverage labels that are regulated by the FDCA."); *Fresh Del Monte Produce Inc. v. Del Monte Foods Co.*, 933 F. Supp. 2d 655, 659 (S.D.N.Y. 2013) (granting an injunction based on a jury finding that defendant's "labels communicat[ed] the false message that

refrigeration of the product was required and fail[ed] to communicate that the product contain[ed] preservatives or [was] pasteurized, in combination with placing the products next to similar fresh fruit products on refrigerated shelves in the fresh produce section of supermarkets").

Here, for following reasons, Grillo's can show each of the elements required for its Lanham Act claim and thus is likely to prevail on the merits.

        (a)    <u>Defendants have made false and misleading statements about Wahlburgers Pickles</u>

The first element of Grillo's Lanham Act claim, that Defendants "ha[ve] made false or misleading statements as to [their] own product," is satisfied here. *Canfield Sci., Inc. v. Melanoscan, LLC*, Civ. No. 16-4636, 2017 WL 2304644, at *8 (D.N.J. May 25, 2017). Specifically, Defendants "have made false or misleading statements as to" Wahlburgers pickles by:

- Stating Wahlburgers pickles have "no preservatives" (Fuoco Decl. Ex. G at 2, 5, 8);

- Stating Wahlburgers pickles are "all natural" (*id.*);

- Stating Wahlburgers pickles are "fresh" (*id.* at 1, 3-7, 9); and

- Failing to list the name of the artificial chemical preservative used in Wahlburgers pickles on their ingredient lists even though it is required to be listed and described as a preservative. (Fuoco Decl. Ex. G; 21 U.S.C. § 343(k) (stating a food is misbranded if it contains "chemical

preservative, unless it bears labeling stating that fact"); 21 C.F.R. § 101.22(j) ("A food to which a chemical preservative(s) is added shall, except when exempt pursuant to § 101.100 bear a label declaration stating both the common or usual name of the ingredient(s) and a separate description of its function, *e.g.*, 'preservative'").)

These statements on Defendants' labels are not only "false and misleading" but are "literally or explicitly false." *See Castrol, Inc.*, 987 F.2d at 943. Biogen's testing indicates that Defendants' Fresh Dill Chips Hot pickles contain sodium benzoate in a concentration of 641 parts per million; Defendants' Fresh Dill Spears pickles contain sodium benzoate in a concentration of between 424 and 436 parts per million; and Defendants' Fresh Dill Chips pickles contain sodium benzoate in a concentration of 600 parts per million. (Kahl Decl. ¶¶ 6-8, 10; *id.* Exs. A, B.) Sodium benzoate is an artificial preservative. (Kahl Decl. ¶ 11.) It is described by the Code of Federal Regulations as an "antimicrobial agent," 21 C.F.R. § 184.1733(c), which the code defines as "substances used to preserve food by preventing growth of microorganism and subsequent spoilage, . . . and the effects listed by the National Academy of Sciences/Natural Research Council under 'preservatives,'" 21 C.F.R. § 170.3(o)(2). Accordingly, Defendants' statement that Wahlburgers pickles contain "no preservatives" is literally and explicitly false because the pickles contain an artificial chemical preservative.

Defendants' statement that Wahlburgers pickles are "all natural" is also literally and explicitly false. Sodium benzoate is an artificial chemical preservative, and the Federal Code of Regulations notes sodium benzoate is "not found to occur naturally." 21 C.F.R. § 184.173(a). Thus, the presence of sodium benzoate in Wahlburgers pickles means the pickles are not "all natural."

Defendants' statement that Wahlburgers pickles are "fresh" is also literally and explicitly false. "Fresh" products do not contain artificial chemical preservatives, and thus because Wahlburgers pickles contain an artificial chemical preservative, they are not "fresh." *See* 21 C.F.R. § 101.95(a) (stating term "fresh" can be used when food "has not been frozen or subjected to any form of thermal processing or any other form of preservation").

Further, Defendants' omission of the name of the artificial chemical preservative used in Wahlburgers pickles from their ingredient lists renders the ingredient lists "literally and explicitly false." Inaccurate statements regarding ingredients are actionable under the Lanham Act and are "literally false." *See Schering-Plough Healthcare Prods, Inc. v. Neutrogena Corp.*, Civ. No. 09-642-SLR, 2010 WL 1992247, at *3-4 (D. Del. May 18, 2010) (finding that statement on a sunscreen product's that the product include an ingredient called "Helioplex" on its labels, when it did not, in fact, contain such an ingredient, was a literally false statement).

17

Unsurprisingly, Courts have routinely found similar labels false and misleading under the Lanham Act. For instance, in *Fresh Del Monte Produce*, the court granted injunctive relief based on Defendants' false labeling that a fruit product needed to be refrigerated. 933 F. Supp. 2d at 659. The jury found Defendants' labels communicated "the false message that refrigeration of the product was required" and failed to communicate that the product contained preservatives or was pasteurized. *Id.*; *see also Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 589 (3d Cir. 2002) (statement that antacid had "Night Time Strength" led to necessary conclusion that antacid had been formulated to treat night-time-specific symptoms; this was literally false because antacid had no difference from regular use antacid that made it formulated to treat night-time symptoms specifically); *Warner-Lambert Co. v. Breathasure, Inc.*, 204 F.3d 87, 90-91 (3d Cir. 2000) (statements promising efficacy of swallow-able capsule to cure bad breath were literally false when plaintiff adduced evidence that capsules had no effect on bad breath); *Castrol Inc.*, 987 F.2d at 943-945 (statements that oil "viscosity breakdown" drives engine performance and that defendant's oil "outperformed" other brands in oil viscosity breakdown led to the necessary conclusion that defendant's oil outperformed other brands; this was literally false because defendant had no factual basis to make such comparison).

Thus, there is no question that the first element of Grillo's Lanham Act claim—that Defendants have made false statements about their products—is satisfied.

        (b)      <u>Because Defendants' statements are literally and explicitly false, a tendency to deceive, actual deception, and materiality are presumed.</u>

Because Defendants' statements are "literally and explicitly false," the second and third elements of Grillo's Lanham Act false advertising claim—that "there is actual deception or at least a tendency to deceive a substantial portion of the intended audience" and "that the deception is material in that it is likely to influence purchasing decisions"—are presumed for the purposes of injunctive relief. *Castrol, Inc.*, 987 F.2d at 943; *Warner-Lambert Co.*, 204 F.3d at 97 (3d Cir. 2000) ("[T]here seems to be no requirement that purchasers actually be deceived, but only that the false advertisements have a tendency to deceive"); *Bracco Diagnostics, Inc.*, 627 F. Supp. 2d at 424 ("[B]ecause I find that some of [Defendant's] claims are literally false, . . . there is a presumption of materiality and deception.").

Nevertheless, even absent such a presumption, it is clear customers are likely to be, and actually have been, deceived by Defendants' false and misleading statements. Defendants falsely state on their pickle labels that Wahlburgers pickles have "no preservatives," are "fresh," and are "all natural," and the labels omit the

name of the artificial chemical preservative used in Wahlburgers pickles from their ingredient lists. (Fuoco Decl. Ex. G.) Wahlburgers pickles also taste extremely similar to Grillo's and use the same containers, same naming conventions, and same nutritional fact panels as Grillo's, which is known nationwide for producing fresh pickles that are free from artificial chemical preservatives. (Compl. ¶¶ 21, 25.) Further, Wahlburgers pickles are sold in the refrigerated section of grocery stores, often alongside other brands, such as Grillo's, that are actually fresh, all natural, and do not contain artificial preservatives. (*Id.* ¶ 32.) Taken together, there is no question that customers are likely to be, and have been, deceived by Defendants' (1) false and misleading statements that Wahlburgers pickles have "no preservatives," are "fresh," and are "all natural" and (2) false and misleading failure to list the artificial chemical preservative used in Wahlburgers pickles on their ingredient lists.

Additionally, customers' purchasing decisions are likely to be, and actually have been, influenced by Defendants' false and misleading statements. Many customers and grocery store buyers prefer foods that are "fresh," "all natural," and free from artificial chemical preservatives over foods that are not. (*Id.* ¶ 51; Fuoco Decl. ¶¶ 15-17, Ex. J at 3, 5; Ex. K at 12, 25; Ex. L at 3, 5.) And, when given the choice, customers opt to purchase foods that are "fresh," "all natural," and free from of artificial chemical preservatives. (*Id.*) Additionally, a large cross section

of customers, particularly those that are a part of the "real food" or "clean labeling" movements, will not consider purchasing products that contain artificial preservatives. (Compl. ¶ 45.)  And, grocery buyers for stores that serve these customers similarly prefer to stock foods that are "fresh," "all natural," and free from artificial chemical preservatives.  (*Id.*)  In short, whether foods are free from artificial chemical preservatives, and hence "fresh" and "all natural," is an important consideration, and often a necessary criteria, for many customers and grocery buyers when deciding what foods to purchase.  (*Id.* ¶¶ 45, 51; Fuoco Decl. ¶¶ 15-17, Ex. J at 3, 5; Ex. K at 12, 25; Ex. L at 3, 5.)  Thus, there is no question that Defendants' false and misleading "fresh," "all natural," and "no preservatives" statements are likely to, and actually have, influenced customers' purchasing decisions.

Accordingly, even though the second and third Lanham Act elements (customer deception and materiality) are presumed and need not be shown by Grillo's to obtain a preliminary injunction, there is no question that customers have been deceived and that their purchasing decisions have been influenced by Defendants' false and misleading statements.

(c)   Defendants' products traveled in interstate commerce.

The fourth element of Grillo's Lanham Act claim, that Defendants' pickles were advertised and traveled in interstate commerce, is also satisfied here.

Advertising a product that travels through interstate commerce suffices to satisfy this element of a Lanham Act claim. *GlaxoSmithKline LLC v. Boehringer Ingelheim Pharms., Inc.*, 484 F. Supp. 3d 207, 225 (E.D. Pa. 2020) (citing *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 922 (3d Cir. 1990)). Defendants' pickles are packaged in New Jersey and are advertised and sold nationwide, including at stores like Walmart and online through delivery services like Instacart. (Compl. ¶¶ 39-40.) Therefore, this element is satisfied.

> (d)  Grillo's is likely to be harmed, and has been harmed, by Defendants' false and misleading statements

The fifth and final element of Grillo's Lanham Act claim—"that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc."—is also satisfied here. A false-advertising plaintiff is harmed by "economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Lexmark Int'l v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014). Importantly, Grillo's is not required to point to specific instances of individualized loss of sales to meet this element. *See U.S. Healthcare, Inc.*, 898 F.2d at 922 (holding that individualization of loss of sales not required to establish Lanham Act liability; "such proof goes to quantum of damages and not the very right to recover").

Here, Defendants' false and misleading statements have harmed Grillo's by virtue of diverted sales, lost shelf space, lost market share, and damaged goodwill that, but for Defendants' false and misleading statements, Grillo's would have retained or earned.  (Compl. ¶ 37.)

(i)     Diverted sales, lost shelf space, and lost market share

Here, Grillo's has been harmed, and will continue to be harmed, because Defendants are diverting sales, shelf space, and market share away from Grillo's to Wahlburgers.  (Compl. ¶ 37.)  Grillo's and Wahlburgers pickles are in direct competition in the fresh pickle market, and there are few, if any, other fresh pickle brands with the same national reach and recognition as Grillo's and Wahlburgers.  (*Id.* ¶ 38.)  Wahlburgers pickles also taste extremely similar to Grillo's, and Wahlburgers uses the same containers, same naming conventions, and same nutritional fact panels as Grillo's.  (*Id.* ¶ 25.)  Grillo's and Wahlburgers pickles are also described similarly,[2] and Grillo's and Wahlburgers are often offered for sale next to each other in the same grocery stores' refrigerated sections and on the same

---

[2]  Grillo's pickle labels state they are "fresh," and Grillo's website states, among other things, that its pickles have "zero artificial preservatives."  (Compl. ¶ 42.)  Similarly, Wahlburgers pickle labels state Wahlburgers pickles are "fresh," have "no preservatives," and are "all natural."  (Fuoco Decl. Ex. G.)  Grillo's pickle labels instruct the consumer to "keep [the pickles] refrigerated," and no artificial chemical preservatives are listed on the ingredient list.  (Compl. ¶ 42.)  Similarly, Wahlburgers labels also instruct consumers to "keep [the pickles] refrigerated," and no preservatives are listed on the ingredient lists.  (Fuoco Decl. Ex. G at 2, 5, 8.)

online shopping platforms.  (*Id.* ¶¶ 38-40.)  For instance, when some customers search for "fresh pickles" at Walmart via the grocery shopping app Instacart, Wahlburgers pickles and Grillo's pickles show up as the first results:



(Fuoco Decl. ¶ 10, Ex. H.)  Additionally, when some customers search for "pickles no preservatives," Wahlburgers pickles and Grillo's pickles again show up as the first results:



(Fuoco Decl. ¶ 11, Ex. I.)

However, unlike Grillo's, lab testing reveals Wahlburgers pickles are not actually fresh, natural, or free of preservatives. (Kahl Decl. ¶¶ 5-11; *id*. Exs. A, B.) Thus, instead of competing fairly by actually producing fresh, artificial-preservative-free pickles, Wahlburgers pickles' entire ability to compete in the fresh, artificial-chemical-preservative-free pickle market is predicated upon Defendants' false statements that Wahlburgers pickles are "fresh," have "no preservatives," and are "all natural." (Fuoco Decl. Ex. G.) Accordingly, any sales, shelf space, market share, or goodwill that Wahlburgers diverted from Grillo's within the fresh, artificial-chemical-preservative-free pickle market would not have occurred but for Defendants' false and misleading statements.

Additionally, upon information and belief, Wahlburgers' clandestine addition of an artificial chemical preservative to its pickles and the effects thereof

afford Wahlburgers pickles a longer shelf life than fresh pickles (Kahl Decl. ¶ 11; Compl. ¶ 43) and allow Defendants to hold inventory longer than they otherwise would be able to hold fresh pickles (Compl. ¶ 43). This artificially enhanced shelf life and ability to hold inventory longer affords Defendants a competitive advantage that is not available to companies that produce fresh pickles, such as Grillo's. (*Id.*) Thus, customers shopping for fresh pickles and grocery store buyers seeking to stock their shelves with fresh pickles have, at times, chosen Wahlburgers over Grillo's pickles based on the fact that Wahlburgers pickles have an artificially lengthy shelf life combined with the false understanding that Wahlburgers is a fresh pickle (*i.e.* does not contain an artificial chemical preservative). (*Id.* ¶ 44.) But for Wahlburgers' false and misleading pickle label statements, these customers and grocery store buyers would not have chosen Wahlburgers and would have chosen Grillo's instead. (*Id.*)

Additionally, a large cross section of customers prefer to purchase products that do not contain artificial preservatives. (*Id.* ¶¶ 45, 51; Fuoco Decl. ¶¶ 15-17, Ex. J at 3, 5; Ex. K at 12, 25; Ex. L at 3, 5.) Others will not consider purchasing products that contain artificial preservatives. (Compl. ¶ 45.) These customers and grocery store buyers that serve these customers, at times, chose to purchase Wahlburgers pickles based on the false belief that they do not contain artificial preservatives. (*Id.*) But for Wahlburgers' false and misleading pickle label

statements, these customers and grocery store buyers would not have chosen Wahlburgers, and many would have purchased Grillo's instead. (*Id.*)

In sum, given the direct competition between Grillo's and Wahlburgers and the fact that there are few other nationwide producers of fresh pickles, it is clear that Grillo's has lost and will continue to lose market share and sales due to Wahlburgers' false and misleading labeling. *See Warner-Lambert Co.*, 204 F.3d at 96-97 (finding that plaintiff was reasonably likely to be injured from competitor's false advertising because the defendant's product's name "falsely tells the consumer that he or she has assurance of fresher breath when ingesting . . . defendant's capsules," which was not true); *Novartis Consumer Health, Inc.*, 290 F.3d at 596 ("In a competitive industry where consumers are brand-loyal, we believe that loss of market share is a potential harm which cannot be redressed by a legal or an equitable remedy following trial") (internal quotation marks omitted).

(ii)   Harm to Grillo's Goodwill

Defendants' false and misleading statements also have harmed, and will continue to harm, Grillo's goodwill.  As discussed *supra*, Wahlburgers is using packaging and labeling extremely similar to Grillo's, has formulated their pickles to taste similar to Grillo's, use naming conventions similar to Grillo's, and use the same nutrition fact panels as Grillo's.  (Compl. ¶ 34.)  And, as seen by posts on social media, many consumers have assumed that Wahlburgers pickles are

manufactured by or owned by Grillo's.  (Fuoco Decl. ¶¶ 12-14.)  For instance, on a Reddit.com thread titled "Thoughts on Wahlburgers Fresh Dill Spears," the most popular comment was the following:



(*Id.*)  And in response to a video review of Wahlburgers pickles posted by a content creator on Tiktok.com, viewers made the following comments:



(Fuoco Decl. ¶ 13.)  The same content creator then created a subsequent video titled "Are @wahlburgersofficial pickles the same as @grillospickles???" after he

"got a lot of comments saying that the Wahlburgers pickles [he] just reviewed are the same pickles as Grillo's." (*Id.* ¶ 14.)  Additionally, in response to one of the comments on his video, the content creator wrote, "[t]here was a lot of people that were convinced they were the same." (*Id.*)

Thus, because of Defendants' deceitful conduct, consumers have assumed and will continue to assume Grillo's is affiliated with Wahlburgers pickles. However, Grillo's has never manufactured its pickles for another brand nor sold its pickles under another company's banner, and Defendants' conduct is thus diluting and harming Grillo's brand image. (Compl. ¶ 41.)  Moreover, the harm Defendants' conduct risks upon Grillo's is all the greater if consumers, who assume Wahlburgers pickles are manufactured by Grillo's, discover Wahlburgers contain considerable amounts of an artificial chemical preservative —which goes against Grillo's entire promise to consumers and ethos as a company. (*Id.* ¶ 21.) Accordingly, Grillo's has been reputationally harmed and will continue to be reputationally harmed by unwanted affiliation with Wahlburgers.

In sum, absent an injunction enjoining Defendants from continuing to make false and misleading statements on Wahlburgers pickle labels (or, in the alternative, an injunction prohibiting Defendants from including artificial preservatives in Wahlburgers pickles), Grillo's will continue to suffer the above described harm.

2.  <u>Defendants' Advertising is False and Misleading Under New Jersey Common Law</u>

Grillo's has also demonstrated a likelihood of success on its unfair competition claim under New Jersey law.  "The test of unfair competition under New Jersey law is identical to the test for unfair competition under § 1125 of the Lanham Act." *Canfield Sci., Inc.*, 2017 WL 2304644, at *8; *see also Castrol, Inc. v. Pennzoil Quaker State Co.*, 169 F. Supp. 2d 332, 340 (D.N.J. 2001) ("It is well established that the test for a common law unfair competition claim under New Jersey law is essentially the same as under the federal Lanham Act.") (quoting *Birthright v. Birthright, Inc.*, 827 F. Supp. 1114, 1140-41 (D.N.J. 1993)).  Thus, for the same reasons that Grillo's has demonstrated it is likely to succeed on its Lanham Act claim, Grillo's has also shown that it is likely to succeed on its New Jersey unfair competition claim.

**C.  <u>Grillo's Has Suffered and Will Continue to Suffer Irreparable Harm if Injunctive Relief is Not Granted</u>**

Because Grillo's has demonstrated that it is likely to succeed on the merits of its Lanham Act claim, Grillo's is "entitled to a rebuttable presumption of irreparable harm[.]"  *See Spark DSO, LLC v. Ormco Corp.*, Civ. No. 21-2841, 2022 WL 613165, at *2 (E.D. Pa. Mar. 2, 2022); 15 U.S.C. § 1116(a) ("A plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm").  Therefore, this element is presumed satisfied.

However, even without the statutory rebuttable presumption of irreparable harm, Grillo's can easily demonstrate it has suffered and will suffer actual, irreparable harm.  "Irreparable injury does not require diversion of actual sales and it can include the loss of control of reputation, loss of trade, and loss of goodwill." *Newborn Bros. Co.*, 481 F. Supp. 3d at 359.  For the reasons explained in Section III(B)(1)(d), *supra*, Grillo's has been irreparably harmed by diversion of sales and loss of market share to Wahlburgers, one of the few competitors in the nationwide fresh pickle market.  Grillo's has also been harmed by damage to its goodwill due to the fact that Defendants' conduct is diluting Grillo's brand by causing consumers to think that Grillo's and Wahlburgers are affiliated when in fact they are not.

### D.   <u>The Balance of Equities Favors Grillo's</u>

The "balance of equities" also tips in Grillo's favor.  As discussed *supra*, the harm to Grillo's is substantial and irreparable: Defendants' false and misleading statements have caused, and will continue to cause, Grillo's to lose customers, market share, shelf space, and goodwill.  Meanwhile, the harm to Defendants is slight.  *See Sweetzel, Inc. v. Hawk Hill Cookies*, No. CIV.A. 95-2632, 1995 WL 550585, at *16 (E.D. Pa. Sept. 14, 1995) ("The burden such an injunction would place on defendants is slight; defendants have no right to misrepresent . . . to gain a competitive advantage" in the market).  Grillo's is only requesting an injunction

that requires Defendants to truthfully advertise its products.  Thus, Defendants will not suffer any undue prejudice from an injunction requiring them to remove false statements they made from the marketplace.  *See Novartis Consumer Health, Inc.*, 290 F.3d at 598 (affirming district court's finding that "any financial loss that will be suffered by [defendant] as a result [of its violative conduct] is self-imposed"); *W.L. Gore & Assocs. v. Totes Inc.*, 788 F. Supp. 800, 812 (D. Del. 1992) ("This Court concludes that these claims were carelessly or irresponsibly made and that any 'prejudice' which accrues can be considered to be self-inflicted.").

### E.    An Injunction Will Serve the Public Interest

Finally, the public interest is decidedly served by the entry of an injunction. Courts have routinely held "[t]he public has a right not to be deceived or confused." *W.L. Gore & Assocs.*, 788 F. Supp. at 812; *Pharmacia Corp. v. GlaxoSmithKline Consumer Healthcare, L.P.*, 292 F. Supp. 2d 594, 610 (D.N.J. 2003) ("[T]he public interest in truthful advertising is obviously served by a court's prohibition of advertising that is plainly false") (quotation marks omitted); *Sweetzel, Inc.*, 1995 WL 550585, at *16 ("[T]he public interest in fair and free markets is promoted by enjoining the [false and misleading misrepresentations]"). Thus, removing products that contain false and misleading statements from the shelves or prohibiting Defendants from selling those products serves the public interest and weighs in favor of granting Grillo's requested injunction.

## IV.    <u>GRILLO'S SHOULD BE GRANTED EXPEDITED DISCOVERY</u>

Expedited discovery is necessary in order to discover the full extent of Defendants' conduct in support of Grillo's Motion for Preliminary Injunction. Rule 26(d) of the Federal Rules of Civil Procedure allows courts broad discretion over the discovery. *See* Fed. R. Civ. P. 26(d). Courts have recognized that expedited discovery is "particularly appropriate" where, as here, "a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings." *Ellsworth Assocs., Inc. v. United States*, 917 F. Supp. 841, 844 (D.D.C. 1996). Indeed, this Court has recognized that if a plaintiff's expedited discovery requests are "narrowly tailored to fit the needs of a preliminary injunction hearing, leave to conduct expedited discovery should be granted." *Sawhorse Enter., Inc. v. Church & Dwight Co., Inc.*, Civ. No. 12-6811 (FLW), 2013 WL 1343608, at *4 (D.N.J. Apr. 3, 2013) (citation omitted).

District courts in this circuit routinely find expedited discovery appropriate where a plaintiff seeks preliminary injunctive relief, including for claims brought under the Lanham Act. *See, e.g.*, *Nail Alliance, LLC v. TTN Beauty*, Civ. No. 21-cv-3140, 2021 WL 2646989, at *4 (D.N.J. Mar. 10, 2021) (granting expedited discovery when plaintiff sought injunctive relief for violation of the Lanham Act); *Exclusive Supplements, Inc. v. Abdelgawad*, Civ. No. 12-1652, 2013 WL 160275, at *1 (W.D. Pa. Jan. 15, 2013) (granting expedited discovery related to information

relevant to upcoming preliminary injunction hearing on plaintiff's Lanham Act claim); *see also Tracey v. Recovco Mortg. Mgmt. LLC*, 451 F. Supp. 3d 337, 344-45 (D.N.J. 2020) (granting expedited discovery and noting that it is "particularly appropriate when a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings.") (citation omitted).

"Leave to conduct expedited discovery . . . is governed by the reasonableness standard." *Better Packages, Inc. v. Zheng*, No. Civ.A. 05-4477 (SRC), 2006 WL 1373055, at *4 (D.N.J. May 17, 2006). Under that standard, the Court should weigh the need for the discovery against the breadth of the discovery requests and the prejudice to the responding party. *Id.* at *3-4.

Grillo's requests expedited discovery here. Grillo's requests are reasonable because they are narrowly tailored to address the immediacy of the current situation and to protect its legitimate business interests. (*See* Fuoco Decl. ¶¶ 18-20; Exs. M-O.) Specifically, Grillo's requests the following discovery included in the Proposed Order attached to this Memorandum of Law:

    a.    Grillo's may serve up to ten (10) requests for the production of documents upon each Defendant within five (5) days of the date of entry of this Order. Objections and responses to document requests, along with responsive documents, must be served and produced

within fifteen (15) days of service of the requests for production of

documents;

b.    Grillo's may serve up to ten (10) interrogatories upon each Defendant

within ten (10) days of the date each Defendant completes its

production of documents in response to Grillo's requests for

production.  Objections and responses must be served within fifteen

(15) days of service of the interrogatories.

c.    Grillo's is granted leave to take depositions, upon seven days' notice,

of a corporate designee of each Defendant.

Grillo's requested expedited discovery is necessary because the evidence of

Defendants' wrongdoing is in their possession.  This includes evidence of:  (i)

Defendants' manufacturing processes for Wahlburgers' pickles, including their use

of an artificial chemical preservative; (ii) Defendants' decision to falsely advertise

their products as being "fresh," "natural," and free of chemical artificial

preservatives, despite their use of an artificial chemical preservative; (iii)

Defendants' intent to deceive consumers about their use of an artificial chemical

preservative; and (iv) Defendants' intent to manufacture their pickles to look and

taste like Grillo's.  Expedited discovery is reasonable and necessary given the

causes of actions alleged and the substantial factual basis that already exists to

prove Grillo's claims.

Grillo's expedited discovery requests are not overly broad.  (Fuoco Decl. ¶¶ 18-20; Exs. M - O.)  Grillo's seeks to propound limited document requests on Defendants followed by targeted interrogatories and depositions of the representatives of Defendants with principal knowledge of the facts relevant to Grillo's preliminary injunction motion.  *See, e.g.*, *Nail Alliance*, 2021 WL 2646989, at *4 (granting expedited discovery consisting of ten Requests for Production and depositions of all defendants with seven days' notice); *Broadway Pine Brands LLC v. Shiro House*, Civ. No. 2:21-cv-406, 2021 WL 5293528, at *7 (W.D. Pa. March 30, 2021) (granting expedited discovery consisting of Interrogatories, Requests for Admissions, and Requests for Production).

Finally, expedited discovery will not pose undue hardship for Defendants. Defendants have the possession, custody, and control of the information Grillo's seeks and the individuals Grillo's seeks to depose.  Allowing Grillo's to request the information now therefore will not only "crystallize the issues for the preliminary injunction hearing, but also will not be wasteful, because much of the information at issue would likely have been turned over anyway by Defendants soon after a Rule 16 conference." *Kone Corp. v. ThyssenKrupp USA, Inc.*, Civ. No. 11-465-LPS-CJB, 2011 WL 4478477, at *7 (D. Del. Sept. 26, 2011).

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Grillo's respectfully requests this Court (1) grant

Grillo's request for expedited discovery and (2) grant Grillo's motion for a

preliminary injunction and enjoin Defendants from continuing to compete unfairly

during the pendency of this lawsuit.


DATED:  January 3, 2023             Respectfully submitted,

                                    **QUINN EMANUEL URQUHART &
                                    SULLIVAN, LLP**

                                    By:  */s/Christina I. Crowley*
                                    Christina I. Crowley
                                    christinacrowley@quinnemanuel.com
                                    51 Madison Avenue, 22nd Floor
                                    New York, NY 10010
                                    Telephone: (212) 849-7000
                                    Facsimile: (212) 849-7100

                                    Marshall M. Searcy III (Pro Hac Vice
                                    Forthcoming)
                                    marshallsearcy@quinnemanuel.com
                                    Gregory A. Fuoco (Pro Hac Vice
                                    Forthcoming)
                                    gregfuoco@quinnemanuel.com
                                    865 South Figueroa Street, 10th Floor
                                    Los Angeles, California 90017-2543
                                    Telephone: (213) 443-3000
                                    Facsimile: (213) 443-3100

                                    *Attorneys for Plaintiff Grillo's Pickles, Inc.*